

# NUMBER 13-07-00489-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

KELLY O'BRIEN SIMPSON,                                   **Appellant,**

**v.**

THE STATE OF TEXAS,                                        **Appellee.**

### On appeal from the 94th District Court
### of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Vela
### Memorandum Opinion by Justice Garza

Appellant, Kelly O'Brien Simpson, was charged by indictment with solicitation of capital murder. *See* TEX. PENAL CODE ANN. § 15.03(a), (d) (Vernon 2003), § 19.03(b) (Vernon Supp. 2007). A jury found appellant guilty. The trial court sentenced appellant to fifteen years' confinement in the Institutional Division of the Texas Department of Criminal Justice ("ID-TDCJ"). By two issues, appellant contends that the trial court abused

its discretion in refusing to grant his motion for a mistrial, and he challenges the legal and factual sufficiency of the evidence adduced at trial.  We affirm.

## I. Factual and Procedural Background

On March 8, 2007, a Nueces County grand jury charged appellant by indictment with solicitation of capital murder.  The indictment provided the following, in relevant part:

> KELLY SIMPSON, defendant,
> on or about AUGUST 23, 2006, in Nueces County, Texas, did then and there with intent that Capital Murder, a Capital Felony, be committed, request, command, or attempt to induce Angel Gomez to engage in specific conduct, to wit:  cause the death of Paul Dembowski for remuneration or the promise of remuneration, that under the circumstances surrounding the conduct of Angel Gomez, as the defendant believed them to be, would have constituted Capital Murder . . . .

Trial began on June 25, 2007.  At trial, the State called three witnesses—Sergeant Laura Oelschlegel of the Nueces County Sheriff's Department, Angel Gomez, and Detective Richard L. Garcia of the Corpus Christi Police Department—while appellant did not call any.

### a. Sergeant Oelschlegel's Testimony

Sergeant Oelschlegel has been employed as a detective with the Nueces County Sheriff's Department for six years.  She testified that appellant and a co-defendant in another case, Dembowski, were incarcerated in the same jail in Nueces County.  The prosecutor informed her that Dembowski told his attorneys of appellant's plot to have him killed.  Another inmate, Gomez, confirmed the plot to Sergeant Oelschlegel after being asked about it.  In reviewing inmate records for the jail, Sergeant Oelschlegel determined that Gomez and appellant were housed in the same unit at the time the events in question transpired.  When she spoke with Gomez, he revealed the plot without being solicited or promised anything in return for his statement.  She testified that inmates are usually

2

reluctant to talk to investigators about what transpires in the jail for fear of being regarded as a snitch and that another officer searched appellant's jail cell and found no evidence in furtherance of the alleged plot.

**b. Gomez's Testimony**

Gomez was an inmate in the Nueces County jail and had been in and out of jail frequently because of several criminal convictions. Gomez was also a member of Raza Unida, a prison gang. When shown a picture of Dembowski, Gomez identified him and stated that he had met appellant and Dembowski while in the Nueces County jail.

Gomez testified that he did not volunteer or seek out law enforcement officials to tell them about the alleged plot to kill Dembowski. Gang intelligence officers pulled him out of his cell, asked him what he was going to do, and informed him that they could "get" him for conspiracy. Gomez was not promised anything by law enforcement officials for making his statement or for testifying.

Gomez first met appellant in August 2006, while both were housed in unit 6-P in the Nueces County jail. Gomez and appellant spoke behind closed doors. Gomez's conversations with appellant eventually escalated to a point where appellant asked for Gomez's help in taking care of somebody. Gomez, thinking that appellant was simply asking him to beat someone up, responded by stating that "it all depends" and that he was "not alone in this." Appellant responded that he would get back to him.

After both appellant and Gomez went to court together on unrelated charges, appellant approached him once again. Gomez testified as follows with respect to the second encounter with appellant:

A [Gomez]: He had asked me—he found out—he says, 'I noticed that—'

he—he was impressed how I approached the bench with the Judge concerning my affiliation, and that's when he approached me the second time, and told me, he asked me, "[w]hat would you charge?" I said, "[c]harge for what?" I said—he said, "I want you to take care of my co—my partner." I said, "[y]our partner?" I said—at first, I didn't know who it was [be]cause I had only been there on one side.

. . . .

A [Gomez]: Like I said, at first, beat him up, touch him up just little bit, and then he turned around and asked me, "[h]ow much do you charge?" I said, "[w]ell, like I said, it all depends." He says [sic], "[w]ell, I want him erased." I said, "[e]rased. What do you mean?" He said, "I want him dropped." In other words, he wanted him dead.

In response to appellant's request, Gomez again told him that he was not alone, his involvement would implicate "his people," and if he was caught, it would be considered organized crime. Gomez did not quote appellant a price at first, but later, he told appellant that he wanted a large sum of money and "two keys."[1] Gomez knew that appellant did not have any money because he did not make many purchases at the commissary and he had a court-appointed attorney. Appellant then made a counter-offer, offering one of the Porsches that he had with an open title. When appellant made his counter-offer, Gomez believed that he was serious.

Gomez was later released from jail, but shortly thereafter, he was arrested on another charge. Gomez was again housed in the same unit as appellant. Later, Gomez was transferred to unit 4-P in the Nueces County jail. At this time, he met Dembowski. Gomez subsequently told Dembowski everything about the alleged plot because he did not want to get wrapped up in such a high-profile case. Gomez then informed appellant that he was not going to get involved. Gomez testified that appellant was disappointed.

---

[1] Gomez testified that "two keys" meant drugs.

4

On cross-examination, Gomez explained that he and appellant communicated with each other through the crack of the jail cell doors, that he was proficient in identifying voices, and that he recognized appellant's voice. Gomez also testified that Dembowski had an established relationship with Gomez's "home boys." In fact, Dembowski occasionally bought Gomez's fellow gang members food and chips at the commissary. Appellant's trial counsel then questioned Gomez about a statement he made regarding appellant's purchases from the commissary and the following exchange ensued:

Q [Appellant's trial counsel]: Okay. And if—if in your statement you indicated that Kelly didn't make any purchase [sic] from [the] jail commissary, would that sound familiar to you?

A [Gomez]: Ever [sic] so often, not as a—not as much as like he intended to have. I mean, if he was willing to—if he was really serious about—like I say, if he was really serious, why would he approach me and ask me to take care of his partner? If he—he had—in the first case, which was the murder, which it was, he didn't—he wasn't going to commissary, okay?

Q: Judge, I'm going to object to nonresponsive, and I'm also going to ask for an instruction to the jury to disregard his statement.

THE COURT: That's sustained. The jury will not—

[Appellant's trial counsel]: And we time [sic] move for—I'm sorry, Your Honor.

THE COURT: The jury will not consider any of his statements as being somewhat nonresponsive. Why didn't [sic] you reask the question.

[Appellant's trial counsel]: Okay. I would also move for a mistrial at this point.

5

THE COURT:                          It's denied.

**c. Detective Garcia's Testimony**

Detective Garcia has been employed in the Criminal Investigations Division of the Corpus Christi Police Department for twenty-one years. In April and May 2006, he investigated a separate case involving both appellant and Dembowski. Detective Garcia identified State's exhibit number 5 as a Texas Certificate of Title for a 1985 Porsche automobile. This certificate of title listed appellant as the purchaser of the Porsche. Both appellant and Dembowski had signed the title documents for the Porsche. Detective Garcia testified that this Porsche was black and was purchased by appellant in Corpus Christi with cash money. He further testified that appellant purchased a second Porsche that was "silver or gold-colored" in San Antonio.

Detective Garcia spoke to Susan Simpson, appellant's mother, on several occasions. After speaking with him, Susan provided Detective Garcia with several letters that appellant had hand-written to her while in jail. The letters were accompanied by the envelopes that appellant had addressed from the Nueces County Jail. At the urging of the State, Detective Garcia then read excerpts from the letters.[2] Detective Garcia recited the following from State's exhibit number 10: "'This may cheer you up. I know it helps me. He [Dembowski] is afraid to come out of his cell in 4-P. He rarely even goes out to shower for some reason. Certain gang members keep fucking with him. I can't imagine how that happened.' And it's got a smiley face on the letter." Detective Garcia then recited the following from State's exhibit number 11, a second letter written by appellant:

---

[2]The first letter, State's exhibit number 10, was dated August 30, 2006, while the second letter, State's exhibit number 11, was mailed on September 5, 2006.

6

"I [appellant] can do nothing about it.  He [Dembowski] won't make it out of the courtroom."

. . . .

Second it says, "I promise you . . . he will not make it long in prison. I have made many friends in here. . . .  I have a high-ranking member of the Mexican Mafia who is a friend, and he is also part of the reason Paul will not leave his cell."

. . . .

Next one, "The ones in here for the worst things are some of the coolest ones.  The older higher-ups"—can't make that one—"members all told if I—there I will be fine.  Imagine me hanging out with the Mexican Mafia under protection, the opposite of what he will have.  I love you, Mom.  Kelly."

Detective Garcia stated that he had read all of the contents of the letters and that the "he" that appellant repeatedly referenced in the letters was indeed Dembowski.  He further stated that the Mexican Mafia and Raza Unida are rival prison gangs and that their members "are generally capable of carrying out violent crimes."

On cross-examination, Detective Garcia testified that when he arrested appellant in May 2006, the automobiles owned by appellant were impounded but were eventually turned over to Susan.  She subsequently sold the two Porsches.  However, at the time of his arrest, the title of one of the Porsches was still in appellant's name.

After Detective Garcia was excused, appellant's trial counsel then repeated his request for a mistrial.  The following exchange occurred:

| [Appellant's Trial Counsel]: | Judge, at this time, for purposes of the record, I would like to reurge [sic] our request for a mistrial, based on the statement Mr. Gomez made on the stand. He indicated that there was a murder case related to Mr. Simpson.  And I believe, based on that, the jury will be tainted to the fact that my client will be unfairly prejudiced. |

7

|                 |                                      |
| --------------- | ------------------------------------ |
| THE COURT:      | Well, I will note that it was upon questioning by Defense Counsel when that occurred, but that's denied. |

The jury subsequently found appellant guilty of solicitation of capital murder. *See id.* § 15.03(a). On June 25, 2007, the trial court certified appellant's right to appeal. On July 16, 2007, the trial court sentenced appellant to fifteen years' confinement in the ID-TDCJ and ordered that this sentence run concurrently with appellant's convictions in Nueces County trial court cause numbers 06-CR-1684-C and 06-CR-1651-C.[3] Appellant timely filed his notice of appeal on July 17, 2007.

## II. ANALYSIS

### a. Appellant's Motion for Mistrial

In his first issue, appellant argues that the trial court abused its discretion in refusing to grant his motion for mistrial following Gomez's reference to an extraneous murder charge. In particular, appellant contends that Gomez's reference to the extraneous murder charge was inadmissible and highly prejudicial pursuant to rules 403 and 404(b) of the Texas Rules of Evidence. *See* TEX. R. EVID. 403, 404(b). The State asserts that appellant failed to preserve this issue for appellate review. The State further argues that even if appellant had preserved this issue, the trial court's instruction to disregard cured any prejudice caused by Gomez's reference to the extraneous murder charge.

#### 1. Standard of Review

---

[3] Though not evident from the record, appellant admits in his brief that both he and Dembowski were indicted for the murder of appellant's father in Nueces County trial court cause number 06-CR-1684-C; he pleaded guilty to the indictment and was sentenced to life in prison on November 13, 2006. The record does not address Nueces County trial court cause number 06-CR-1651-C.

An appellate court reviews a trial court's ruling on a motion for mistrial using an abuse of discretion standard of review. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007) (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id.*; *see Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

"Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *see Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003). Generally, a prompt instruction to the jury to disregard the objectionable testimony will cure error, including references to extraneous offenses. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). The determination of whether an error justifies a mistrial is made by examining the particular facts of the case. *See id.*; *see also Reynolds v. State*, No. 13-05-00643-CR, 2007 Tex. App. LEXIS 6139, at *14 (Tex. App.–Corpus Christi Aug. 2, 2007, no pet.) (mem. op., not designated for publication). A mistrial is required only when the testimony is "clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on the minds of the jury." *Westmoreland v. State*, 174 S.W.3d 282, 290 (Tex. App.–Tyler 2005, pet. ref'd) (quoting *Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999)). A reviewing court will presume the jury will follow the trial court's instructions to disregard improper testimony. *Id.* (citing *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998)).

### 2.    Discussion

The original objection made by appellant's trial counsel was that Gomez was nonresponsive. The trial court sustained the objection and instructed the jury to disregard Gomez's response as nonresponsive. Appellant's trial counsel did not argue that Gomez's statement prejudiced appellant and that the information provided was inadmissible until closing argument. Because appellant's trial counsel originally objected to the responsiveness of Gomez's answer and failed to make his 403 and 404(b) objections until closing argument, we conclude that appellant has not preserved this issue for appeal. *See* TEX. R. APP. P. 33.1 (providing that "[a]s a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a *timely request, objection, or motion*" stating the specific grounds for the desired ruling if the specific grounds are not apparent from the context) (emphasis added); *see also Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh'g) (holding that an objection under both rules 403 and 404(b) is required to preserve error regarding the admission of evidence of an extraneous offense); *Zayas v. State*, No. 13-04-532-CR, 2005 Tex. App. LEXIS 9693, at **5-6 (Tex. App.–Corpus Christi Nov. 17, 2005, no pet.) (mem. op., not designated for publication) (concluding that the failure to specifically make a rule 403 or rule 404(b) objection to the trial court in a timely manner does not preserve error).

Moreover, even if the issue had been preserved, the trial court's instruction to the jury to disregard Gomez's statement was sufficient to cure any error that may have arisen from the statement. Detective Garcia testified that appellant and Dembowski had been

10

investigated in another case in April or May of 2006.[4]  Furthermore, Gomez testified, without objection, that appellant and Dembowski were involved in another "high-profile case," in explaining why his "people" would not carry out the alleged plot to kill Dembowski. It is also noteworthy that the complained of testimony was elicited by appellant's trial counsel, thus supporting a finding that the testimony was given inadvertently.  A mistrial is required only when the testimony is clearly calculated to inflame the jury and that curative instructions are unlikely to prevent prejudice to appellant.  *See Westmoreland*, 174 S.W.3d at 290; *see also Hawkins*, 135 S.W.3d at 77 (holding that a mistrial is warranted when the improper conduct is so prejudicial as to render the continuation of the trial wasteful and futile and that only in extreme circumstances, when the prejudice is incurable, will a mistrial be required); *McKay v. State*, 707 S.W.2d 23, 36 (Tex. Crim. App. 1985) (holding that in order for an improper argument to rise to a level mandating reversal, the argument must be "extreme or manifestly improper, or inject new and harmful facts into evidence").  Furthermore, we must presume that the jury followed the trial court's instructions to disregard Gomez's statement.  *See Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999); *Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987); *Allen v. State*, 202 S.W.3d 364, 370 (Tex. App.–Fort Worth 2006, pet. ref'd).[5]  Because the

---

[4] In fact, appellant concedes this fact in his brief when he states that "[t]he murder-for-hire jury was aware from the testimony of both Sgt. Oelschlegel and Sgt. Garcia that [a]ppellant and Dembowski had been investigated in another case."

[5] In *Gardner*, the Texas Court of Criminal Appeals noted that:

In the vast majority of cases in which argument is made or testimony comes in, deliberately or inadvertently, which has no relevance to any material issue in the case and carries with it some definite potential for prejudice to the accused, this Court has relied upon what amounts to an appellate presumption that an instruction to disregard the evidence will be obeyed by the jury. In essence, this Court puts its faith in the jury's ability, upon instruction, consciously to recognize the potential for prejudice, and then consciously to discount the prejudice, if any, in its deliberations. Thus we say the harm deriving from the unresponsive answer has been "cured."

11

record contains testimony regarding another "high-profile" investigation involving appellant and Dembowski that was not objected to, and because a prompt instruction to the jury to disregard the objectionable testimony usually will cure error involving references to extraneous offenses, the trial court did not abuse its discretion in refusing to grant appellant's motion for mistrial.  Accordingly, appellant's first issue is overruled.

**b.      Legal and Factual Sufficiency of the Evidence**

In his second issue, appellant argues that the evidence supporting his conviction is legally and factually insufficient.  We disagree.

**1.      Standard of Review**

In a legal sufficiency review, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Watson v. State*, 204 S.W.3d 404, 414-17 (Tex. Crim. App. 2006).  The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-39; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd).  We do not reevaluate the weight and credibility of the evidence, whether circumstantial or direct, nor do we substitute our own judgment for that of the trier of fact. *Mosley v. State*, 141 S.W.3d 816, 821 (Tex. App.–Texarkana 2004, pet. ref'd); *Beckham*, 29 S.W.3d at 151. Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151.

---

730 S.W.2d 675, 696 (Tex. Crim. App. 1987) (internal citations omitted).

Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994); *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987)). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor; circumstantial evidence alone can be sufficient to establish guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). On appeal, both circumstantial and direct evidence cases are examined using the same standard of review. *Id.*

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). "Such a charge would accurately set out the law, would be authorized by the indictment, and would not unnecessarily increase the State's burden of proof." *Malik*, 953 S.W.2d at 240. A person commits the offense of solicitation if, "with intent that a capital felony or felony of the first degree be committed, he requests, commands, or attempts to induce another to engage in specific conduct that, under the circumstances surrounding his conduct as the actor believes them to be, would constitute the felony or make the other a party to its commission." TEX. PENAL CODE ANN. § 15.03(a).

In a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust. *Watson*, 204 S.W.3d at 414-15. After considering all of the evidence in the record related to appellant's sufficiency challenge, we compare the evidence weighed by the jury

13

that tends to prove the elemental fact in dispute with the evidence that tends to disprove it. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997) (en banc). This Court will not reverse the jury's verdict unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 415.

## 2. Discussion

In arguing that the evidence supporting his conviction is legally and factually insufficient, appellant states that: no corroborating evidence of the alleged plot was found in appellant's jail cell; no other inmates testified regarding the conversations between Gomez and appellant; appellant could not have provided the Porsche because it was in police custody since his arrest; appellant's criminal history was non-violent so he was unlikely to have committed this offense; Gomez was a Raza Unida member, not a Mexican Mafia member, as mentioned in appellant's letters to his mother; and Gomez's testimony was not credible because law enforcement allegedly threatened to charge him with conspiracy to commit capital murder.

Despite appellant's arguments, we find that the jury was rationally justified in finding that the State proved the essential elements of solicitation of capital murder beyond a reasonable doubt. *See* TEX. PENAL CODE ANN. § 15.03(a). Appellant sought out Gomez to see if he or "his people" would kill Dembowski. In exchange for doing this, appellant offered the Porsche to which he had open title. *See id.* § 19.03(a)(3) (providing that a person commits the offense of capital murder if the person receives remuneration or is promised remuneration in exchange for killing another). Though the timing is not clear from the record, the Porsche was turned over, at some point, to Susan while appellant was

still in jail. Therefore, it was possible that appellant was capable of directing Susan to provide the Porsche to Gomez as payment. In any event, it was within the province of the jury to make a reasonable inference that appellant believed that he was capable of providing the Porsche as payment to Gomez for the killing of Dembowski at the time he made his counter-offer. *See Hooper*, 214 S.W.3d at 13, 15-16 (holding that the jury, as the trier of fact, may draw reasonable inferences from the facts and that the reviewing court must give deference to such inferences).

Section 15.03(b) provides that a person may not be convicted of criminal solicitation based solely on the "uncorroborated testimony of the person allegedly solicited unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation." Tex. Penal Code Ann. § 15.03(b). However, it appears that the jury did not rely solely on Gomez's testimony in establishing appellant's intent to have Dembowski killed. As previously mentioned, appellant wrote letters to Susan indicating that Dembowski would not make it out of the courtroom, that Dembowski will not make it long in prison, and that Dembowski will not leave his cell because of appellant's relationship with prison gang members. Appellant's letters to Susan corroborate Gomez's testimony and provide the jury with sufficient evidence to make a reasonable inference that appellant intended to have Dembowski killed. *See Hooper*, 214 S.W.3d at 13, 15-16. Therefore, it was not necessary for the State to present testimony of other inmates to corroborate Gomez's testimony regarding his conversations with appellant. *See id.* at 13; *Guevara*, 152 S.W.3d at 49.

In addition, the fact that no evidence of the alleged plot was found in appellant's jail cell is not dispositive because appellant's letters and Gomez's corroborated testimony

15

establish that appellant intended to have Dembowski killed. It was not incumbent upon the State to provide tangible, direct evidence, as appellant seems to suggest, to establish the essential elements for the offense given that circumstantial evidence alone may support a conviction and it is the cumulative force of the evidence that guides our review. *See Hooper*, 214 S.W.3d at 13; *Guevara*, 152 S.W.3d at 49. Appellant's remaining contentions were within the province of the jury to decide and we are prohibited from re-weighing the evidence and substituting our judgment for that of the jury. *See Mosley*, 141 S.W.3d at 821; *Beckham*, 29 S.W.3d at 151.

Based on the foregoing, we conclude that the jury was rationally justified in finding guilt beyond a reasonable doubt and that the jury's verdict is not against the great weight and preponderance of the evidence. Therefore, the evidence adduced at trial is legally and factually sufficient to support appellant's convictions. Accordingly, we overrule appellant's second issue.

### III. CONCLUSION

Having overruled both of appellant's issues on appeal, we affirm the judgment of the trial court.

_____
DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 21st day of August, 2008.